**Stephen KING, Plaintiff,**

v.

**ALLIED VISION, LTD., New Line Cinema Corporation and Innovation Books, a division of the Innovative Corporation, Defendants.**

No. 92 Civ. 3852 (CBM).

United States District Court, S.D. New York.

March 25, 1994.

Cowan, Liebowitz & Latman, P.C. by Paul R. Levenson, Peter A. Herbert, New York City, for plaintiff.

Leventhal Slade & Krantz by Melvyn R. Leventhal, Laura F. Dukess, New York City, for defendants.

## MEMORANDUM OPINION

MOTLEY, District Judge.

Plaintiff Stephen King ("King") moves for an order to hold defendant New Line Cinema Corporation ("New Line") in contempt of court for violating the Final Consent Decree settling the promotion and distribution of the "The Lawnmower Man" videocassette. Defendant, in turn, has cross-moved for sanctions and attorneys fees. Plaintiff has also filed a post-trial motion under Rule 11 of the Fed.R.Civ.P. against defendant seeking sanctions for maintaining a frivolous defense and filing a frivolous cross-motion.

For the following reasons, plaintiff's contempt motion is granted and defendant is ordered to cure its contempt within thirty days of this opinion and pay damages as outlined herein. However, defendant's cross-

motion and plaintiff's post-trial Rule 11 motion are both denied.

## FINDINGS OF FACT

### I. Background

1. In this action, which was commenced on May 28, 1992, plaintiff Stephen King sought injunctive and monetary relief for defendants' alleged misattribution to King of the motion picture entitled "The Lawnmower Man" through use of both "possessory" and "based upon" credits in violation of, *inter alia*, § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).

2. On July 2, 1993, after a three day evidentiary hearing, this court entered a preliminary injunction prohibiting defendants from utilizing King's name in connection with the "Lawnmower Man" film, included as part of the "possessory" and "based upon" credits.

3. On July 16, 1992, the Second Circuit granted in part defendants' motion for a stay of the preliminary injunction order as it applied to the "based upon" credit.

4. The Second Circuit ultimately affirmed the preliminary injunction order as to the possessory credit but reversed as to the based upon credit, although both issues remained open for the plenary trial. *King v. Innovation Books*, 976 F.2d 824 (2d Cir. 1992).

5. Immediately after it obtained the partial stay referred to in ¶ 3 hereof, New Line, through its subsidiary New Line Home Video, Inc. and its licensees, Columbia Tri Star Home Video, Inc. (in the United States) and Alliance Releasing Co., Inc. (in Canada), commenced distribution of hundreds of thousands of videocassettes in packages or so-called "sleeves" that bore the words "Based on a Story by Stephen King" in two places: (a) in small letters as part of the "credit block" on the back of the sleeve; and (b) in larger letters constituting a three inch long credit prominently placed on the front of the sleeve.

6. On May 13, 1993, following additional discovery and shortly before the plenary trial of this action was scheduled to commence, a Settlement Agreement was executed by all parties.

### II. The Final Consent Decree

7. Among its various provisions, the Settlement Agreement incorporated by reference a Final Consent Decree which was simultaneously executed by the parties and signed by this court on May 17, 1993 (the "Decree").

8. ¶ 1(a) of the Decree prohibited, among other things, all use of King's name worldwide in connection with "The Lawnmower Man" film and all related properties and products, in all media, in broad, sweeping terms, as follows:

> Defendants, their parents, affiliates and subsidiaries, and all officers, directors, agents, servants, employees, licensees, distributors, successors and assigns thereof, and all other persons or entities in active concert or participation with any of them ... shall not use Stephen King's name, directly or indirectly, anywhere in the world, on or in connection with the motion picture ... entitled "The Lawnmower Man" ... in any medium or format ... including, without limitation, ... distribution on videocassette for home use or otherwise ... or in connection with any advertising or promotion of any of the foregoing....

9. ¶ 2 of the Decree required New Line to immediately distribute to all entities participating in the distribution or other commercial exploitation of "The Lawnmower Man" a copy of the Decree, together with a Letter of Instruction, in the form annexed as Exhibit 1 to the Decree, that explained in simple, direct language the terms of the Decree and demanded compliance therewith:

> Each of the Defendants shall take immediate steps to provide by certified mail return receipt requested ... a copy of this Final Consent Decree to all its respective licensees, distributors, successors and assigns embraced by the terms hereof, and all other persons or entities to which each of the Defendants has granted, or grants in the future, the right to engage in any of the commercial activities or forms of exploitation described in ¶ 1(a) hereof, ac-

companied by a letter of instruction in the form annexed hereto as Exhibit 1 ... which explains the terms of the Final Consent Decree, and demands assurance that they will, in all respects, abide thereby.

10. ¶ 4 of the Decree required that all entities that had received distribution of "The Lawnmower Man" videos be supplied with "paste-over" stickers to obliterate King's name from all existing and future inventory of such videos, or alternatively, new sleeves making no reference to King, together with a detailed cease and desist letter demanding that the recipients of the paste-over stickers or new sleeves make the corrective application or substitution, as applicable, and informing them of the terms of the Decree:

> Each of the Defendants shall supply all of its wholesalers or others to which it has made distribution of videocassettes or other formats of the Motion Picture with package "paste-over" stickers, or alternatively, new packages on which the name of Stephen King is not displayed, and demand in a letter, sent by certified mail, ... which shall accompany the "paste-over" stickers and/or new packages being provided to said wholesalers or others that such entities affix the new "paste-over" covers onto the old packages, or, alternatively, replace the old packages with the new packages, and further issue instructions to such entities to cease and desist from all advertising or promotion relating to the Motion Picture ... which is not in strict conformity with the mandates of the Final Consent Decree.

11. ¶ 6 of the Decree required defendants to furnish King's counsel within 30 days with affidavits "describing with particularity the efforts undertaken by each of them to effectuate compliance" with the requirements of the Decree.

### III. *New Line's Noncompliance with the Mandates of the Final Consent Decree*

A. Noncompliance with ¶ 2.

12. With the exception of ¶ 6, neither the consent decree nor the settlement agreement

contain any specific deadlines for compliance. However, New Line was required to take "immediate steps" to effect compliance which became effective on May 17. Sonya Thompsen, New Line's Vice President for Business Affairs Administration and the primary employee responsible for ensuring compliance, was not provided with a copy of the Decree or even assigned this responsibility until at least June 10, 1993, more than three weeks after the Decree was signed. After receiving a copy of the Decree, Thompsen sent each distributor and licensee the letter required by ¶ 2 by certified mail with return receipt requested on or about June 14, 1993. Tr. 71–76, 462, 468.

### B. Noncompliance with ¶ 4.

13. As previously noted, ¶ 4 of the Decree required New Line to disseminate to its "wholesalers or others to which it has made distribution" either paste-over stickers designed to obliterate all references to King on the existing sleeves, or new sleeves that bore no mention of King.

14. Before the court signed the Decree, New Line was preparing to manufacture new corrected sleeves in which to package videocassettes manufactured after entry of the Decree. As early as May 6, 1993, Philip Jarboe testified that he ordered new packaging ("sleeves") for all new manufacturing occurring after May 17, 1993 deleting all references to King's name. However, New Line did not distribute any corrective stickers or new sleeves pursuant to ¶ 4 of the Decree for the purpose of correcting existing inventories of wholesalers and retailers until July 7–9, 1993 (the "first mailing"). Tr. 116–17, 124–28, 174.

15. The first mailing contained a paste-over sticker designed to cover only the small reference to King contained in the credit block on the back of the sleeve (Exhibit 26) but did not include a paste-over sticker to eliminate the prominent three inch "based upon" credit to King that appeared on the front of the sleeve.[1] Tr. 140–47.

---

1. Even this defective mailing was unduly delayed. Philip Jarboe, Director of Production and

Distribution for New Line Home Video, Inc. received 50 sample stickers on June 14 but did not

16. King's counsel and a retailer which had received the first mailing complained of this omission to New Line on July 9, 1993. However, New Line did not correct this error until August 13–15, 1993, more than one month after the first mailing and nearly three months after the Decree was signed, when it mailed new sleeves which bore no reference to King (the "second mailing"). Exs. 13 and 25; Tr. 186, 158–59, 452–55; Ex. M.

17. With respect to the mailings to retailers in the United States, the first mailings contained eight stickers for each retailer and the second mailing contained ten new sleeves for each retailer, without regard to the number of videocassettes the retailers actually had in their inventories. In fact, no effort was made to determine how many stickers or sleeves each retailer might actually require, nor was any effort made to determine how difficult it might be to obtain that information in connection with either the first or second mailings. Tr. 180–82, 240.

18. As previously noted, ¶ 4 of the Decree provided that the required mailings were to be made by certified mail, return receipt requested. Notwithstanding that express requirement, the first mailing was made by third class mail. Exs. K & M; Tr. 241–42. Although New Line's outside general counsel, Richard Blumenthal, Esq., represented at various times that New Line did not use certified mail because (a) the Post Office "would not accept" it (Ex. 14), (b) it was "virtually impossible," and (c) it was "too expensive," he admitted during the hearing that certified mailing actually was possible. Tr. 456–58. In fact, the agency utilized by New Line to effect both mailings was originally instructed to use certified mail for the second mailing and was working on a computer program to expedite such a mailing when New Line subsequently instructed it to terminate the procedure. Exs. 28 & 29; Tr. 236–38, 314–317, Affidavit of Rose Huttas, Ex. 1 to Defendant's Notice of Cross–Motion at 3–4.

19. ¶ 4 of the Decree also provided that New Line demand in a letter, "sent by certified mail," that the recipients affix the new paste-over stickers or replace the old sleeves with the new sleeves, as applicable, and cease and desist from any activity in connection with the subject work that was "not in strict conformity with the mandates of this Final Consent Decree."

20. However, no such letter accompanied either the first or second mailings. Mr. Jarboe, who approved the letters that accompanied the mailings, admitted that he did not consult the Decree to determine the form of letter required to be included in the mailings. Exs. K & M; Tr. 190–192, 223–35.

21. The first mailing included a promotional letter that merely requested the recipients' cooperation and closed with an expression of appreciation for making "The Lawnmower Man" a success. The letter neither referred to nor enclosed a copy of the Decree, as required by ¶ 4. Ex. 4.

22. The second mailing included a similar promotional letter but also enclosed a copy of the form letter of instruction annexed to the Final Consent Decree and a copy of the Decree itself. Ex. M. However, the letter of instruction was simply a copy of Exhibit 1 to the Decree, not addressed to the recipient (the salutation read "Dear _____"), and was not signed. Furthermore, the copy of the Decree enclosed with the mailing omitted the page bearing the signature of the court.

C. Noncompliance with ¶ 1.

23. ¶ 1 of the Decree prohibited defendants from any use of King's name in connection with "The Lawnmower Man" in any manner throughout the world.

24. On or about May 6, 1993, New Line supplied its packaging manufacturer with new sleeve film for the manufacture of new sleeves that omitted all references to King. Commencing on May 18, 1993, all new manufacturing orders for "Lawnmower Man" videocassettes were filled in the new sleeves in compliance with ¶ 1 of the Decree. Tr. 116–17, 324.

25. However, New Line expressly permitted all manufacturing orders received through the date of the Decree to be com-

place an order for their manufacture until June

25. Tr. 164–65.

pleted and filled in the old sleeves that bore the proscribed references to King, although (a) it made no effort to determine how many units would be so produced, and (b) it knew those proscribed packages invariably would enter the stream of commerce and be sold and distributed by its licensees, wholesalers and, ultimately, retailers, after the Decree was issued. Ex. 31, ¶ 3; Tr. 323–32, 368–71.

26. Following the court's execution of the Decree, no effort was made to recall those offending sleeves from the stream of commerce. On or about June 16, 1993, a month after the Decree was entered, there remained in the inventories of New Line's distributors and wholesalers between 24,000 and 54,000 videocassettes packaged in offending sleeves. Ex. K at 2; Tr. 133–34, 335.

D. Noncompliance with ¶ 6

27. As previously stated, ¶ 6 of the Decree required New Line to supply King's counsel with affidavits evidencing compliance with its terms within 30 days of its effective date.

28. On June 15, 1993, New Line's outside general counsel Richard Blumenthal, also an officer, director and stockholder of New Line, provided to King's counsel the affidavit of Sonya Thompsen, New Line's Vice President of Business Affairs Administration ("Thompsen Aff.") as required by ¶ 6 of the Decree. ¶ 3 of the Thompsen Aff. contained the statement that "New Line has supplied its wholesalers and others to which it has made distribution of videocassettes and video discs of the motion picture with new packages on which the name of Stephen King is not displayed." Ex. 9; Tr. 411.

29. During the hearing on plaintiff's motion, Thompsen acknowledged that: (a) she had no personal knowledge of the facts alleged in ¶ 3 of her compliance affidavit at the time she signed the affidavit; and (b) she made no effort to determine whether the "new packages" referred to in her affidavit in fact had been sent. Tr. 86–90.

30. The statement in ¶ 3 of the Thompsen Aff. that new packages had been supplied for video discs was false. The evidence at the hearing demonstrated that new packages for video discs were not available until at least July 19, 1993, and were used after that time only to fill new manufacturing orders; no new video disc packaging was ever sent to wholesalers or retailers for replacement of the old, proscribed packaging, although eighteen thousand video discs of "The Lawnmower Man" were sold. Tr. 344–49.

31. In addition, the inference clearly intended to be drawn from the language of ¶ 3 of the Thompsen Aff. was that new packages had been furnished to all prior recipients of the videocassettes in sufficient quantity to replace all of the former, proscribed packaging. While Thompsen admitted during the hearing that this was the plain import of ¶ 3 of her affidavit, she also testified that she had no knowledge of whether such activity had occurred at the time she signed the affidavit. Tr. 90–91. As noted above, the second mailing, which was the first time new sleeves were distributed by New Line for the purpose of replacing old sleeves, did not occur until August 1993.

32. The compliance affidavit submitted by Peter Fifield ("Fifield Aff."), Vice President of New Line Home Video, Inc., was similarly false and misleading. The affidavit was also submitted to King's counsel by Blumenthal on July 7, 1993. Ex. 12.

33. The Fifield Aff., executed on July 6, 1993, stated that "Columbia Tri Star Home Video and its wholesale and retail outlets, including Blockbuster Home Video, have been sent new containers for videocassettes for the Lawnmower Man which makes [sic] no reference to Stephen King along with stickers to place over the credit box of existing cassette containers." Ex. 12.

34. As Fifield testified during the hearing, the most reasonable implication to be drawn from this language was that New Line had forwarded new packaging to replace the existing packaging that bore the proscribed credits to King. As previously stated, since the second mailing did not begin until August 13, 1993, Fifield's affidavit was false and misleading at the time it was issued. Even Fifield admitted that the language was misleading in this regard. Tr. 386–87.

35. Further, Fifield testified that he did not have personal knowledge of the facts alleged in his affidavit when he signed it but rather relied on Jarboe's assurance that the facts set forth in the affidavit were true without seeking to confirm their accuracy. Tr. 378–81.

36. Finally, Blumenthal, himself, provided King's counsel with a letter on June 17, 1993 (Ex. 8) that stated that "Blockbuster Video ... has been furnished with new video cassette covers with instructions to substitute them for the old covers." During his testimony, Blumenthal admitted that this representation was false. Blumenthal claimed to have received the false information from New Line's President Stephen Einhorn. Tr. 424–25, 439.

E. New Line's Alleged "Inadvertence"

37. New Line claims that it did not effect any mailings pursuant to ¶ 2 of the Decree until June 14, 1993 because it did not receive a copy of the Final Consent Decree until June 10, 1993. Thus, it was not aware that the Decree had been signed until a copy of the signed Decree was forwarded to Blumenthal by Robert Serio, Esq., counsel for Allied Vision, Ltd. However, New Line has offered no evidence that it attempted to ascertain whether the Decree was signed prior to that time or whether it attempted to secure a copy of the Decree. Blumenthal did not even inquire of New Line's litigation counsel whether the Decree was signed until "several weeks" after it was submitted to the court for signature. Tr. 414–16. Moreover, New Line was represented by its own litigation counsel in the action and it has not contended or introduced any evidence tending to show that its counsel made any effort to obtain a copy of the signed Decree either from the court, the clerk's office, or other counsel in the action.

38. Additionally, although New Line was not bound by the Decree until it was signed, New Line was aware that it was bound by the Settlement Agreement which incorporated the terms of the Final Consent Decree as of the time that agreement was executed on May 13, 1993. Tr. 458–59. However, as noted above, New Line undertook no compliance activity until mid-June 1993, when it received a copy of the Decree from its codefendant.

39. Further, even though New Line was provided with a copy of the Decree on June 10, it did not take any action to comply with ¶ 4 until the ineffective first mailing (of credit block stickers) was made approximately month later, during July 7–9, 1993, and then only in response to prodding by King's counsel. Exs. 7, 10 & 11. In fact, neither Fifield nor Jarboe, the two individuals responsible for ensuring compliance by New Line Home Video, Inc. with the terms of the Decree received a copy of the Decree until mid-June and early July 1993 respectively. Tr. 190–93, 359.

40. New Line's excuse for including in the first mailing a sticker to cover only the credit block on the back of the sleeve, while leaving uncovered the prominent credit to King on the front of the sleeve, was that it was informed by its codefendant, Allied Vision, Ltd., in a letter dated May 28, 1993, that the back stickers were "sufficient." Ex. B; Tr. 98. However, New Line, a party to this action has advanced no authority in either the Settlement Agreement or the Final Consent Decree, which allowed it to rely on the clearly erroneous instructions of a codefendant in effecting compliance.

41. Moreover, Thompsen, the primary employee in charge of compliance at New Line, admitted that she never saw the video sleeve to which the stickers were to be supplied, and never sought to examine the sleeve to confirm that the back stickers were sufficient to effect compliance. She also admitted that the Allied Vision letter enclosed a "title treatment" for the video, which was not placed in evidence by New Line and which might have depicted the front panel of the video sleeve. Tr. 103–04.

42. Fifield claims that, although a copy of the sticker was provided to him prior to the first mailing, and the sticker was annexed to his July 6, 1993 affidavit of compliance, he never paid sufficient attention for him to realize that the sticker would only cover the back of the sleeve. Thus, although he was in charge of ensuring New Line's compliance

with the Decree, he never sought to examine the stickers to determine whether they would effect compliance. Tr. 375–79.

43. Even Jarboe, the Director of Production and Distribution for New Line, testified that he merely followed orders in distributing the credit block stickers, although he fully realized that it did nothing to eliminate the front panel credit. Tr. 140–47.

44. Blumenthal claimed that he was not aware that there was a credit to King on the front of the video sleeve and, therefore, he was not aware that the credit block sticker for the back of the sleeve would not effect compliance. He further testified that he, like Thompsen, did not seek to examine the sleeve to determine whether the credit block sticker was sufficient to effect compliance with the requirements of the Decree. Tr. 443–47.

45. New Line now concedes that the first mailing of the credit block stickers did not comply with the requirements of ¶ 4 of the Decree. Tr. 80–81, 447.

46. Although the inadequacy of the back sticker mailing was brought to New Line's attention on July 9, and although New Line already had in production videocassette sleeves that did not bear any reference to King which were used to satisfy new manufacturing orders, New Line did not attempt to correct this problem until it commenced the second mailing on August 13, 1993. *See* ¶ 16, *supra.*

47. Finally, New Line claims that ¶ 4 of the Decree did not require that any mailings be made to retail video stores. However, Jarboe testified that his understanding of ¶ 4 did require mailings to retailers. Tr. 260. As a result, New Line undertook direct mailings to retailers in an attempt to comply with the Decree.

### F. The Effect of New Line's Conduct

48. On August 3, 1993, plaintiff's investigation of five Manhattan video retailers revealed that in every outlet Lawnmower Man videos were offered for sale and/or rent bearing the proscribed credits to King. A further investigation on October 11, 1993 to eight additional outlets also revealed that

Lawnmower Man videos were offered for sale and/or rent in packages bearing the proscribed credits. Tr. 20–28, 31–42.

49. On October 25–27, 1993, plaintiff conducted a final investigation of defendant's compliance by sending Mr. James M. Mulligan, a private investigator, to 16 retail video outlets in Boston, Chicago, Los Angeles, Miami and Atlanta. Tr. 50–62.

50. As a result of Mulligan's investigation, plaintiff learned that 67 out of 76 Lawnmower Man videocassettes observed bore the proscribed credits to Mr. King. Of the fifty that were offered for video rental, 41 bore the "based upon" credit to King on the front of the sleeve and the "possessory credit" on the back of the sleeve. The remaining nine videos were contained in the new packages that bore no reference to King. *Id.*

51. Further, of the 26 that were offered for sale, 24 bore both proscribed credits. Two videos offered for sale had the credit block sticker on the back of the sleeve but still bore the proscribed "based upon" credit to King on the front of the sleeves. *Id.*

52. At the hearing conducted by this court, thirteen (13) offending videocassette packages purchased in thirteen different retail outlets on October 11, 25, 26 and 27 were received in evidence along with their respective sales receipts. Tr. 42–46, 62–67; Exs. 15A1, 15A2, 15B1, 15B2, 15C1, 15C2, 15D1, 15D2, 19A–I, and 20A–I.

## CONCLUSIONS OF LAW

### I. Plaintiff's Contempt Motion

■ "The imposition of a civil contempt order is a severe sanction subject to a higher standard of proof than the 'preponderance of the evidence standard' applicable to ordinary civil cases." *Hart Schaffner & Marx v. Alexander's Department Stores, Inc.,* 341 F.2d 101, 102 (2d Cir.1965). Thus, a court may find a party in contempt only if the complainant proves: 1) that there is a clear and unambiguous order; 2) that the contemnor has not complied with such order; and 3) that the contemnor "has not been reasonably diligent and energetic in attempting to accomplish what was ordered." *Drywall Ta-*

*pers, Local 1974 v. Local 530*, 889 F.2d 389, 394 (2d Cir.1989), *cert. denied,* 494 U.S. 1030, 110 S.Ct. 1478, 108 L.Ed.2d 615 (1990).

■ In this case, plaintiff has requested that we find defendant in contempt of its obligations under the Final Consent Decree signed by this court on May 17, 1993. After fully considering the pleadings submitted by the parties and the evidence introduced at trial, this court finds plaintiff in contempt of the Final Consent Decree.

■ A consent decree is "an agreement of the parties entered upon the record with the sanction and approval of the court." *Schurr v. Austin Galleries of Illinois, Inc.,* 719 F.2d 571, 574 (2d Cir.1983) (citations omitted). While a consent decree is a judicial pronouncement, it should be construed like a contract and traditional principles of contract law apply. *Firefighters v. City of Cleveland,* 478 U.S. 501, 519, 106 S.Ct. 3063, 3073–74, 92 L.Ed.2d 405, 421 (1986); *Crumpton v. Bridgeport Educ. Ass'n,* 993 F.2d 1023, 1028 (2d Cir.1993) (citing *Securities and Exchange Comm'n v. Levine,* 881 F.2d 1165, 1178 (2d Cir.1989)). Accordingly, "the scope of a consent decree must be discerned within the four corners," *Firefighters Local Union No. 1784 v. Stotts,* 467 U.S. 561, 574, 104 S.Ct. 2576, 2586, 81 L.Ed.2d 483, 496 (1984), and a court construing such document must not expand or contract the agreement as set forth in the decree. *Crumpton,* 993 F.2d at 1028.

Under the terms of the Decree, defendant was essentially required to: 1) notify its licensees and distributors of the Lawnmower Man by certified mail of the terms of the consent decree and enclose a letter instructing them to abide thereby (¶ 2); 2) supply its wholesalers or distributors with "paste-over" stickers or new packages which deleted all references to Stephen King also accompanied by a letter of instruction (¶ 4); and 3) provide King's counsel or designated representative with affidavits detailing their efforts to comply within thirty days of the effective date of the Decree. (¶ 6). After reviewing the transcript of this trial, we find that defendant has

failed to adequately comply with each of these obligations.

## A. New Line's Noncompliance with Paragraph 2 of the Decree

■ As stated previously, in reaching its findings, this court must give full consideration to the clear and unambiguous language of the decree. Although the parties did not include a specific deadline for New Line to mail the Decree to its licensees and distributors, they did agree that it would "take immediate steps" to effectuate compliance. Decree, ¶ 2. Yet, despite such language, defendant did not fulfill its obligation under ¶ 2 until June 14, 1993, almost one month after this court signed the consent decree.

In its defense, New Line claims that it was delayed in sending out the certified mailing because its co-defendant, Allied Productions, failed to send it a copy of the Final Consent Decree until June 10, 1993.[2] However, this court is clearly unpersuaded by such contentions.

Since New Line actively participated in the settlement negotiations, it was fully aware that it had an obligation under the Decree. Sonya Thompsen testified that although she had not received a copy of the final consent decree until June, she had seen an earlier draft in April, at which time she began drafting an internal memorandum for immediate distribution informing the various departments that New Line was "no longer allowed to use any reference to Stephen King" on its videocassette packages. Tr. 75, 92–94. After receiving this communication, Philip Jarboe testified that on May 6, 1993, he "took action to provide new film to the printing plant, to insure that no reference to [ ] King's name would be on any sleeves after [the] date [he provided] the film." Tr. 117.

A brief investigation by this court reveals that after the Final Consent Decree was signed on May 17, it was filed with the Clerk of the United States District Court on May 18, 1993. Following the established procedures of this District of which all federal

---

2. Richard Blumenthal ("Blumenthal"), New Line's General Counsel, testified that he did not receive a copy of the consent decree until June

10, 1993 from Robert Serio, General Counsel for Allied Productions, at which time he forwarded the Decree to Sonya Thompsen at New Line.

practitioners are aware, the Clerk then published a notice in the New York Law Journal on May 20, 1993, stating that the order had been signed. Had defendant's counsel taken such basic steps to investigate the status of the order, no doubt New Line would have learned that it was signed and taken action long before June 14, 1993.

■ Once a settlement was reached, it is obvious that plaintiff would be anxious to have the entertainment community immediately notified of the terms of the agreement. New Line received effective notice through the New York Law Journal that the decree had been signed. *In re O.P.M. Leasing Services, Inc.*, 769 F.2d 911, 917 (2d Cir.1985). Accordingly, New Line had a duty to inquire about the status of the Decree—a responsibility that could not be satisfied by relying on the representations of a co-defendant. *Id.* Considering the clear purpose of ¶ 2, we find that defendants' compliance was untimely and should result in a finding of contempt.

### B. New Line's Noncompliance with Paragraph 4 of the Decree

■ We additionally find New Line in contempt for failing to adequately delete Stephen King's name from its outstanding videocassette inventory. The plain language of the Decree specifically required New Line to: 1) "supply all of its wholesalers or others to which it has made distribution of videocassettes ... with package 'paste-overs' or ... new packages" deleting all references to Stephen King; 2) accompany the mailings with a letter, sent by certified mail instructing the entities to either affix the references to King or destroy the old packages and replace them with new ones, depending on which alternative is chosen; and 3) further instruct the entities to "cease and desist from all advertising or promotion relating to the motion picture ... or the King short story which is not in strict conformity with the mandates of [the] Final Consent Decree." Decree, ¶ 4. Likewise, this court finds that defendant did not take the necessary steps to effectively comply with any of these tasks.

New Line claims to have provided its wholesale distributor, Columbia Tri Star and its fulfillment center, Promotions Distributor

Services Corporation ("PDS") with "bulk quantities of paste-over stickers (250,000) and copies of the Consent Decree and letter of instructions [sic]". Defendant New Line Cinema Corporation's Proposed Findings of Fact and Conclusions of Law, ¶ 26. From the surface, this appears to have adequately complied with the Decree. However, a closer review of the evidence refutes such a finding.

While defendant admits that it agreed to send either stickers or new sleeves to effectuate the objective of eliminating all references to King, its first mailing only included stickers designed to cover the smaller possessory credit located on the back of the videocassette package. As stated, the company sent no stickers to cover the larger "based-upon credit" located on the front of the box. When asked why New Line had not ordered a sticker to cover the front of the box when it initially ordered the sticker on June 25, 1993 (over two weeks after New Line allegedly received the Decree), Philip Jarboe, Supervisor of Production and Distribution, stated that he was not aware that the based upon credit should be eliminated. Tr. 141. This testimony directly contradicted his earlier testimony where he claimed to have received the Thompsen memorandum in April 1993—the same memorandum which allegedly prompted him to initiate production on new videocassette sleeves eliminating all references to King. Tr. 124, 127–29, 144–47. This violation was not corrected until it was brought to New Line's attention by plaintiff's counsel.

Further, in its first mailing, defendant ignored the requirement that it send a draft letter instructing the recipients to comply with the terms of the Decree. Instead, Jarboe obtained the assistance of the sales department which had no knowledge of the terms of the Decree to draft a promotional letter which clearly lacked the seriousness intended by the Decree. *See* ¶¶ 20–21, *supra*. Again, Jarboe admitted during his testimony that he did not check the provisions of the Decree to determine whether New Line's letter complied with ¶ 4. Tr. 193.

Most importantly, New Line contends that the language of ¶ 4 "fully supports a finding that the consent decree clearly and unambiguously did *not* require New Line to send materials to wholesalers and retailers but rather *only* to *either* its distributor Columbia Tri Star *or* its wholesalers." Def.'s Find. Fact/Concl. Law, ¶ 21 (emphasis in original). We agree. However, by clearly opting to supply both its wholesalers and others "to which it has made distribution" of the videocassettes, we find that it assumed the responsibility for a wholesale and retail distribution that fully complied with the terms of the consent decree. Accordingly, such distribution was required to be competently made, a finding that we cannot make based on the evidence presented.

Following its second mailing in August 1993, defendant made no effort to determine the actual number of videocassette packages in circulation, so it had no idea whether the mailings were adequate to cover the outstanding Lawnmower Man inventory. Tr. 180–84. Defendant has also introduced no evidence that it followed up with either its wholesalers, distributors or retailers to determine whether the mailings were adequate. To the contrary, plaintiff has introduced evidence of a retailer who, after receiving eight (8) credit block stickers, had to contact defendant to obtain fifty (50) additional stickers. *See* ¶ 17, *supra;* Tr. 183. Thus, we find defendant in contempt of ¶ 6 of the Decree.

### C. New Line's noncompliance with Paragraph 6 of the Decree

█ Likewise, we find defendant in violation of ¶ 6 of the Decree. Since it failed to adequately comply with ¶¶ 2 or 4 of the Decree, defendant clearly has not properly complied within the required thirty days. Further, plaintiff has convincingly proven that several of defendant's employees merely signed affidavits prepared by New Line's general counsel without making any attempt to verify the truthfulness of the statements contained therein. *See* ¶¶ 28–36, *supra.* Accordingly, we find that any affidavits submitted by June 17, 1993 were defective and in violation of ¶ 6.

Defendant argues that these acts of non-compliance are merely "inadvertent" mistakes that should preclude a finding of contempt. We disagree. In August and October 1993, plaintiff conducted three separate investigations that uncovered the same result—an overwhelming number of videocassette packages that still bore references to King. Ex. 15 to Plaintiff's Notice of Motion for Contempt, Declaration of Vincent McCleary; Tr. 20–30, 51–69. Notwithstanding the previous distributions, it is impossible for this court to find that defendant effected "dutiful and energetic compliance" with the Decree. We therefore find that plaintiff has proven by clear and convincing evidence that defendant is in contempt of the Final Consent Decree entered by this court on May 17, 1993.

### II. Plaintiff's Request for Sanctions

█ Upon finding defendant in contempt for not complying with the terms of the consent decree, we next turn our attention to the question of sanctions. It is well-established that a court may award sanctions in a contempt proceeding in order to: 1) coerce the defendant into compliance with the court's order; or 2) compensate the complainant for the losses sustained. *United States v. United Mine Workers of America,* 330 U.S. 258, 304, 67 S.Ct. 677, 701, 91 L.Ed. 884, 918 (1947); *Vuitton et Fils S.A. v. Carousel Handbags,* 592 F.2d 126, 130 (2d Cir. 1979).

### A. Plaintiff's Damages for Noncompliance

█ Where the sanction is awarded to enforce compliance, courts have discretion in fashioning an appropriate remedy. *United Mine Workers,* 330 U.S. at 304, 67 S.Ct. at 701, 91 L.Ed. at 918; *Carousel Handbags,* 592 F.2d at 130. The court should consider several factors in exercising its discretion, including "the character and magnitude of the harm threatened by continued contumacy, ... the probable effectiveness of any suggested sanction in bringing about the [desired result]," and "the amount of the defendant's financial resources and the consequent seriousness of the burden to that particular defendant." *United Mine Workers,* 330 U.S.

at 304, 67 S.Ct. at 701, 91 L.Ed. at 918. However, the ultimate consideration is whether the coercive fine is reasonably related to the facts and not arbitrary. *Perfect Fit Industries v. Acme Quilting Co.*, 673 F.2d 53, 57 (2d Cir.), *cert. denied,* 459 U.S. 832, 103 S.Ct. 73, 74 L.Ed.2d 71 (1982).

On two separate occasions after this court signed the Decree, plaintiff found evidence of defendant's noncompliance. Moreover, during the course of this trial in October 1993, plaintiff's third investigation revealed a sample of videocassette packages which still overwhelmingly contained references to King. Thus, even after commencing the second mailing, defendant still has not adequately complied with the Decree.

■ We understand that defendant will not be able to track down every single copy of the Lawnmower Man videocassette to affix a sticker or replace a sleeve. However, its previous mailings were clearly no more than rough approximations designed to effectuate a "token" compliance with the terms of the Decree. Defendant has established no definite criteria for determining the number of proscribing videocassettes in the market, a task which was obviously necessary if it hoped to achieve any meaningful compliance. Accordingly, we hold that New Line must take any action necessary to cure the contempt at all wholesale and retail outlets within thirty days of this opinion.

In remedying this contempt, defendant is required to contact all entities to which it has distributed videocassettes and the previous mailings to determine their current inventory of the Lawnmower Man and whether the entities have received adequate corrective stickers to comply with the Decree. Defendant must then correct any deficiencies within this thirty day period. At the end of this period, plaintiff is entitled to conduct one final investigation to measure defendant's compliance and submit its findings to this court. If, based on those findings, this court finds that defendant has not substantially complied with the aforementioned requirements, it will be required to pay a fine to plaintiff in the amount of $10,000 per day until its noncompliance is cured.

### B. Plaintiff's Compensatory Damages

■ In awarding compensatory damages, the complainant must generally prove that he has sustained an actual injury. *United Mine Workers,* 330 U.S. at 304, 67 S.Ct. at 701, 91 L.Ed. at 918. However, the Second Circuit has awarded damages under a theory of unjust enrichment without requiring such proof. *Manhattan Industries v. Sweater Bee by Banff, Ltd.,* 885 F.2d 1, 6 (2d Cir.1989) *cert. denied,* 494 U.S. 1029, 110 S.Ct. 1477, 108 L.Ed.2d 614 (1990). In such cases, courts have based sanctions on the defendant's profits because they focus on the defendant's wrongdoing as opposed to the damage suffered by the complainant. *Id.*

■ In *Sweater Bee,* the Second Circuit considered whether to award compensatory sanctions against a clothing manufacturer for violating a consent judgment governing the use of a trademark. In its decision, the court rejected the District Court's finding that the complainant was not entitled to compensatory damages because it failed to prove an actual injury. Relying on the Supreme Court's decision in *Leman v. Krentler–Arnold Hinge Last Co.,* 284 U.S. 448, 52 S.Ct. 238, 76 L.Ed. 389 (1939), the Second Circuit found that compensatory relief in a civil contempt action included "profits derived by the contemnor from [the] violation of a court order" as an "equivalent or substitute for legal damages where damages have not been shown...." *Sweater Bee,* 885 F.2d at 6. Accordingly, the court held that plaintiff was "entitled to those profits derived by [the contemnor] from the unlawful sales of [the complainant's] merchandise ... [during] the period in which [it] was in civil contempt of the district court's consent judgment." *Id.* at 7.

■ It is clear from the evidence presented that defendant has profited and continues to profit from the use of Stephen King's name. Therefore, plaintiff is entitled to any unlawful profits that defendant earned from either the sale or rental of the Lawnmower Man videocassette and laser disc during its period of noncompliance. Defendant will, accordingly, be ordered to produce to plaintiff and to this court, within thirty days

of this opinion, a detailed statement of all net profits derived from the sale and rental of the Lawnmower Man videocassette and laser disc from May 17 until the date of this opinion and order. The statement must be prepared by an independent certified public accountant. In arriving at net profits, defendant is allowed to deduct any necessary and related expenses, understanding that it bears the burden of proving these costs. *Sweater Bee*, 885 F.2d at 7; *see also Oral–B Laboratories Inc. v. Mi–Lor Corp.*, 810 F.2d 20, 26 (2d Cir.1987). We further find that plaintiff is entitled to recover all attorneys fees and related costs incurred in bringing and litigating this motion.

## III. Defendant's Motion for Sanctions

■ In response to plaintiff's contempt motion, defendant has cross-moved for sanctions and attorneys fees, arguing that plaintiff's motion "is based upon an inadvertent but immediately corrected administrative error and non-cooperation by third parties to the Decree." Defendant's Memorandum of Law in Opposition to Motion for Contempt Judgment and in Support of Cross–Motion for Sanctions.

For the reasons previously discussed, this court finds that plaintiff has offered clear and convincing evidence that defendant's noncompliance was neither "inadvertent" nor "immediately corrected." Accordingly, defendant's motion is denied.

## IV. King's Post–Trial Rule 11 Motion

■ Finally, plaintiff has brought a post-trial motion under Rule 11 of the Fed. R.Civ.P. against defendant for maintaining a frivolous defense to his contempt motion and bringing a frivolous cross-motion for sanctions. For the reasons set forth below, plaintiff's motion is denied.

■ Rule 11 allows the court to impose a variety of sanctions upon attorneys who file frivolous or unwarranted papers. *Richardson Greenshields Securities Inc. v. Lau*, 819 F.Supp. 1246, 1269 (S.D.N.Y.1993) (Motley, J.) After researching the legislative history of amended Rule 11, the Second Circuit held that:

[S]anctions shall be imposed against an attorney and/or his client when it appears that a pleading has been interposed for any improper purpose, *or where*, after reasonable inquiry, a competent attorney could not form a reasonable belief that the pleading is well grounded in fact and is warranted by existing law or a good faith argument for the extension, modification or reversal of existing law.

*Eastway Construction Corp. v. City of New York*, 762 F.2d 243, 254 (2d Cir.1985); *see also Investors Ins. Co. of America v. Dorinco Reinsurance Co.*, 917 F.2d 100, 106 (2d Cir. 1990); *International Shipping Co., S.A. v. Hydra Offshore, Inc.*, 875 F.2d 388, 390 (2d Cir.), *cert. denied*, 493 U.S. 1003, 110 S.Ct. 563, 107 L.Ed.2d 558 (1989).

■ Rule 11 was enacted to discourage dilatory and abusive litigation tactics as well as to eliminate frivolous claims and defenses. *McMahon v. Shearson/American Express, Inc.*, 896 F.2d 17, 21 (2d Cir.1990). However, the rule is not a fee-shifting device that automatically mandates an award whenever a party loses its claim. To the contrary, "courts must strive to avoid the wisdom of hindsight in determining whether a pleading was valid when signed and any and all doubts must be resolved in favor of the signer." *Eastway Constr.*, 762 F.2d at 254.

Plaintiff has produced no evidence that defendant's motion was brought in bad faith or to vex its adversary. Further, even though the evidence presented at trial led this court to disagree with defendant's arguments, we still believe that defendant's attorney did make a reasonable inquiry of the facts surrounding this case at the time he signed the pleadings. Based on the facts presented before trial, defendant's second mailing of corrective stickers did appear to comply with the Decree; it was not until plaintiff elicited testimony from defendant's management during the trial that it became clear that the second mailing failed to adequately correct its noncompliance. Thus, we do not find the actions of either defendant or its counsel sanctionable under Rule 11. Plaintiff's motion is denied.

454

## CONCLUSION

For the reasons stated above, this court finds defendant New Line Home Video in contempt of the Final Consent Decree signed by this court on May 17, 1993. As a result, New Line must cure this contempt to the satisfaction of this court no later than thirty days from the effective date of this opinion and accompanying order. Should the court find that defendant has not complied with this court's order, it shall be required to pay plaintiff a fine of ten thousand dollars ($10,-000) per day until such contempt is cured. In addition, plaintiff is entitled to the net profits which defendant has earned from the exploitation of plaintiff's name during its period of contempt. Accordingly, defendant will be required to submit to plaintiff and to this court a detailed statement of revenues and expenses derived from the sale and rental of the Lawnmower Man videocassettes and laser discs during its period of contempt within thirty days of the effective date of this opinion.