**Stephen KING, Plaintiff,**

v.

**ALLIED VISION, LTD., New Line Cinema Corporation and Innovation Books, a division of the Innovative Corporation, Defendants.**

**No. 92 Civ. 3852 (CBM).**

United States District Court,
S.D. New York.

Feb. 27, 1995.

Cowan, Liebowitz & Latman, P.C., Paul R. Levenson, New York City, for plaintiff.

Leventhal Slade & Krantz, Melvyn R. Leventhal, Laura F. Dukess, New York City, for defendant.

## Opinion on Contempt Purging

MOTLEY, District Judge.

### FINDINGS OF FACT

1. In this court's opinion and order dated March 25, 1994 ("March Opinion"), 155 F.R.D. 440, defendant New Line Cinema Corporation ("New Line") was held in contempt of the Final Consent Decree ("Decree") entered in this action on May 17, 1993. Pursuant to the Decree, New Line was enjoined from using Stephen King's name in connection with the film "The Lawnmower Man," and was required to take certain enumerated steps—including distribution of corrective stickers or new packaging for The Lawnmower Man—designed to remove King's name from copies of previously distributed videocassette and laser disc versions of the film.

2. New Line was held in contempt of the Decree on a number of grounds. Plaintiff has raised the following issues to determine if New Line has purged itself of contempt.

a. failure to send the corrective mailings made pursuant to the Decree by certified mail, return receipt requested (March Opinion, at 443–445);

b. failure to enclose with those mailings (i) a copy of the Decree that included the page bearing the signature of the court, and (ii) a letter that expressly demanded compliance with the Decree (March Opinion, at 445, 449);

c. failure to enclose with those mailings stickers and sleeves sufficient to enable the removal of Stephen King's name from all videocassettes and discs in the distributors' inventories (March Opinion, at 444, 449);

d. failure to conduct any follow up to determine whether the mailings were adequate (March Opinion, at 451);

e. failure generally to undertake more than token compliance with the requirements of the Decree, or to effect "dutiful and energetic compliance" with the Decree (March Opinion, at 448, 451), including permitting the continued distribution from inventory of videocassettes packaged in sleeves impermissibly bearing the name of Stephen King, thus demonstrating an indifference to the quantity of offending videocassettes in the marketplace (March Opinion, at 443).

3. New Line was ordered to "take any action necessary to cure the contempt at all wholesale and retail outlets within 30 days . . ." (March Opinion, at 452).

4. In addition, as part of its cure efforts, New Line was directed to "contact all entities to which it has distributed videocassettes and the previous mailings to determine their current inventory of the Lawnmower Man and whether the entities have received ade-

quate corrective stickers to comply with the Decree. Defendant must then correct any deficiencies within this thirty day period." (March Opinion, at 452).

*New Line's Compliance with the March opinion and Order*

5. New Line's litigation counsel in this action, Melvyn R. Leventhal, Esq., was placed in charge of New Line's effort to cure its contempt. Apparently, no officer or employee of New Line itself was involved in any of New Line's cure-related activities or decision making, beyond delegation of this task to Leventhal. (11/1/94 Tr. 28, 69).

6. Mr. Leventhal retained a mass mailing service, Promotions Distributor Services Corporation ("P.D.S."), to conduct the mailings to be made pursuant to the March Opinion. Rose Huttas, P.D.S.'s vice president of customer relations, was the person at P.D.S. in charge of this project. (11/1/94 Tr. 29–30. Mr. Leventhal directly supervised Huttas on at least a daily basis. (11/1/94 Tr. 29–30; Ex. 12, ¶ 1).

7. Between April 7 and April 9, 1994, P.D.S. sent mailings on behalf of New Line to 25,334 video retailers, and to 226 video wholesalers and distributors (the "initial mailing") (11/1/94 Tr. 35, 42; Huttas Dep., pp. 123–24).

8. The initial mailing included an inventory report form and a form letter requesting the recipients to complete and return the form by fax or mail. Although the form letter referred to the fact at three separate places that the request was made pursuant to court order, once again no signed copy of the Decree was enclosed. (11/1/94 Tr. 35–38, 45; See Ex. 10).

9. In addition, once again, the initial mailings were not sent by certified mail, return receipt requested, but rather by first class mail pursuant to Leventhal's express instructions to P.D.S. (11/1/94 Tr. 42; Huttas Dep., pp. 117–18).

10. Because New Line wanted complete and meticulous records of every step of the mailing, P.D.S. was instructed to keep a record of the names and addresses of all the entities to which the letters were sent, as well as a record of the date of mailing.

(11/1/94 Tr. 46; Huttas Dep., pp. 28–29 and attached Ex. 3).

11. The first class mailing used envelopes bearing preprinted bulk mailing imprints, rather than postage stamps or postage metering. (11/1/94 Tr. 42–43; Exs. 6A and 6B; Huttas Dep., pp. 119–20).

12. P.D.S. was instructed to make copies of each completed inventory reports alphabetically by each of the 50 states. (Tr. 46). A representative of P.D.S. personally ensured that each response was dated and that a copy was made and then filed as instructed. (Huttas Dep., p. 28–29).

13. New Line gave detailed instructions to P.D.S. pertaining to the proper distribution of corrective materials. The process included drafting follow-up letters for the entities that returned the completed forms and obtaining effective pasteover stickers for videocassettes and laser discs as well as replacement sleeves for used videocassettes. In the case of the laser discs, the stickers were redesigned after New Line determined that the initial lay-out was too confusing. (11/1/94 Tr. 52). Leventhal again drafted letters and personally tested the stickers and sleeves to assure that they completely obliterated King's name from the packages. (11/1/94 Tr. 49–50, 52–53; Exs. 8A and 8B attached to Huttas Dep.).

14. New Line then made arrangements to deliver the stickers and sleeves to P.D.S. and gave P.D.S. detailed instructions on how to respond to the completed inventory report forms. (11/1/94 Tr. 47–48; Ex. 7 to Huttas Deposition). With respect to responding to retailers' inventory report forms, P.D.S. was instructed to fill-out the response letter with the date of the response as well as the name and address of the retailer to which it was to be sent. P.D.S. was then required to enclose with the letter (1) at least as many front and back paste-over stickers as the inventory report form reported for new and used, rated and unrated videocassettes containing references to King; (2) the number of unrated replacement sleeves as the inventory report form reported for unrated used videocassettes with references to King; and (3) the number of rated sleeves as the inventory

report form reported for rated used video-cassettes with references to King. (11/1/94 Tr. 47–48; Ex. 7 to Huttas Deposition).

15. To respond to distributors whose inventory report forms reflected videocassettes containing references to King, P.D.S. was similarly instructed to fill out the response letter with the date of response as well as the name and address of the distributor, and to enclose with the letter at least the number of front and back paste-over stickers equal to the number of rated and unrated videocassettes with King's name on them. (11/1/94 Tr. 47–48; Ex. 7 to Huttas Dep.).

16. New Line instructed P.D.S. that, up until April 19, 1994, all mailings were to be via First Class Mail. After that date, P.D.S. used guaranteed two-day and overnight delivery service to ensure that corrective materials were delivered within the 30–day deadline established by the court. From and after April 25, 1994—and continuing to the present—all letters, stickers and/or sleeves were sent by Federal Express overnight service. (11/1/94 Tr. 54; Huttas Dep., p. 50 and attached Ex. 18).

17. New Line then provided P.D.S. with paste-over stickers, a follow-up letter and detailed instructions for retailers and distributors whose inventory report forms recorded copies of laser discs containing references to King. (11/1/94 Tr. 51). P.D.S. made copies of the laser follow-up letter, filled each one in with the date of the response and the name and address of the entity to which it was being sent and filled out a specially-designed form instructing the P.D.S. warehouse how many sets of laser disc paste-over stickers should be included in the package—a number equal to the number of laser discs indicated on the inventory form with references to King, rounded up to the nearest five. (11/1/94 Tr. 53; Huttas Dep., pp. 38–39; Ex. 10).

18. The laser disc follow-up letter also stated that the purpose of New Line's actions was to "Eliminat[e] Stephen King's Name from Laser Discs of The Lawnmower Man Pursuant to Court Order." The letter then "demands" that the recipients "immediately affix the stickers to copies of your laser disc version of The Lawnmower Man containing Stephen King's name" in accordance with the detailed instructions that follow. (11/1/94 Tr. 37; Ex. 12 to Huttas Dep.). The letter continues by providing specific instructions of how and where to place the four separate paste-over stickers to completely obliterate King's name from each laser disc package. (Id.)

19. Like the retailer and distributor videocassette follow-up packages, P.D.S. was instructed to begin by sending the laser disc follow-ups by First Class Mail, but to then change to guaranteed two-day and then overnight delivery as the 30–day deadline approached. (11/1/94 Tr. 53; Huttas Dep., pp. 39–40).

20. Of the 25,334 video retailers to whom the initial mailing was directed, only 3,368 (13%) responded and reported on their inventory. Of the 226 video wholesalers and distributors to whom the initial mailing was directed only 52 (23%) responded. Therefore, corrective materials were forwarded to the responding entities only. (11/1/94 Tr. 58, 88; Huttas Dep., pp. 142–44).

21. New Line did not conduct any follow-up of any kind with respect to the 87% of retailers and 77% of wholesalers and distributors that did not respond to the initial mailing. (11/1/94 Tr. 88–90, 92–93; Huttas Dep., pp. 143–46). Therefore, 21,966 retailers and 174 wholesalers and distributors were not affected by New Line's cure activities.

22. However, New Line did undertake follow-up on those retailers who sent inventory report forms only partially filled out. New Line instructed P.D.S. to conduct a phone survey to determine how many of the cassettes actually had references to King. If it was not possible to find out this number, P.D.S. was to send stickers and sleeves for the total number of Lawnmower Man cassettes in the store. (11/1/94 Tr. 55–56; Huttas Dep., pp. 43–44 and attached Ex. 14).

23. Several of the fax transmissions of inventory report forms were unreadable or contained only limited information. When possible, P.D.S. called the sender and asked for a retransmission. (11/1/94 Tr. 61–62; Huttas Dep., pp. 57–58).

24. In one specific instance, several faxes were unreadable except for the Indianapolis zip code 46220 and Leventhal drafted a one paragraph note which P.D.S. sent by Federal Express to all the stores in the 46220 zip code explaining that one of the stores had sent a completed inventory report form, but since New Line could not determine which store it was, it had opted to send the required stickers and sleeves and instructions to all eight stores. (11/1/94 Tr. 62; Huttas Dep., pp. 59–60 and attached Ex. 25).

*Plaintiff's Compliance Investigation*

25. The March Opinion entitled plaintiff, at the end of New Line's 30 day cure period, "to conduct one final investigation to measure defendant's compliance and submit its findings to the court." (March Opinion, at 452). Accordingly, in May 1994, plaintiff dispatched two private investigators to visit video retail outlets across the United States and report their observations.

26. Between May 10 and May 14, 1994, investigator James Mulligan visited a total of 37 randomly selected video retail outlets in Detroit, San Francisco, Denver, Houston, New Orleans and Washington, D.C. He observed in these outlets a total of 85 Lawnmower Man sleeves on display of which 67 (80%) bore credits to plaintiff King which were impermissible under the Decree. (11/1/94 Tr. 118–21, 124; Ex. 1).

27. In each of these 37 outlets, Mr. Mulligan conducted an oral survey by asking the store manager, assistant managers or, when they were unavailable, the counter clerk, the following question: "Have you received a request from New Line Cinema during the month of April or in the last several weeks to inventory your stock of videos concerning the Lawnmower Man?" The response in each of the 37 sites was "No." (11/1/94 Tr. 122–24).

28. Between May 18 and May 22, 1994, investigator Patrick Barry visited 16 video retail outlets in Boston, Chicago, Los Angeles, Miami and Atlanta. These were the same stores that had been visited by Mr. Mulligan in October 1993 and that were the subject of Mr. Mulligan's testimony in the contempt hearing on October 29, 1993. (11/1/94 Tr. 129–32; Ex. 3).

29. In these 16 outlets, Mr. Barry observed a total of 26 Lawnmower Man video sleeves on display, of which 16 (62%) bore the impermissible credits to King. (11/1/94 Tr. 131).

30. Mr. Mulligan purchased videocassettes bearing the impermissible credits to King in 11 of the outlets he visited, and Mr. Barry purchased videocassettes bearing such impermissible credits in 3 of the outlets he visited. Copies of the sleeves which contained the credits prohibited by the Decree, and the corresponding sales receipts reflecting the Mulligan and Barry purchases, were received in evidence as Exhibits 2 and 4, respectively. (11/1/94 Tr. 13, 14).

31. The Declarations of Messrs. Mulligan and Barry were furnished to the Court and to New Line's counsel on May 27, 1994. Despite New Line's knowledge of the results of these investigations since that time, New Line (a) made no effort to supply corrective materials to the outlets identified, and (b) offered no evidence tending to show that the state of the marketplace was any better than that indicated by the observations of Messrs. Mulligan and Barry. (11/1/94 Tr. 104).

## CONCLUSIONS OF LAW

In the March Opinion, this court stated:

Accordingly, we hold that New Line must take any action necessary to cure the contempt at all wholesale and retail outlets within thirty days of this opinion.

In remedying this contempt, defendant is required to contact all entities to which it has distributed videocassettes and the previous mailings to determine their current inventory of the "Lawnmower Man" and whether the entities have received adequate corrective stickers to comply with the Decree. Defendant must then correct any deficiencies within this thirty day period. (March Opinion, at 452).

The burden rests on New Line to demonstrate that it has been "reasonably diligent and energetic" in acting to cure its contempt. *Drywall Tapers, Local 1974 v. Local 530*, 889 F.2d 389, 394 (2d Cir.1989), *cert. denied*, 494 U.S. 1030, 110 S.Ct. 1478, 108 L.Ed.2d 615 (1990). This court finds that New Line has

not cured itself of contempt of the Decree in accordance with the March Opinion. The clear and unambiguous purpose of the March Opinion was to compel New Line to do that which its failure to do previously gave rise to the March contempt citation, i.e., to take effective steps to supply corrective materials to the marketplace in a manner designed, and in sufficient quantities, to enable the removal of Stephen King's name from the Lawnmower Man videos remaining in the marketplace that bore the credits to King forbidden by the Final Consent Decree.

A. New Line's Failure to use Certified Mail

■ Under the terms of the Consent Decree, defendant was required to notify its licensees and distributors of the Lawnmower Man by certified mail of the terms of the consent decree, enclose a copy of the Decree, and enclose a letter instructing them to abide thereby. Instead of following the clear requirements of the Decree and the March Opinion, New Line used First Class Mail with bulk mail imprints and did not enclose a copy of the Decree. It is completely disingenuous for defendant to claim that this was not a requirement of the purge order. This court also does not recognize New Line's ability to change the terms of the March Opinion or the Decree itself by deciding that First Class mail would be more effective than the agreed upon use of certified mail, return receipt requested. Defendant was ordered to affirmatively contact these entities. Reading this requirement against the terms of the Decree, the meaning of contact did mean using certified mail. It was and remains the duty of defendant to ensure that these entities actually received the initial mailing. The proper manner agreed to by the parties in the Decree was certified mail, return receipt requested. While it may be true that it would be more time consuming to attain compliance by using certified mail, defendant never sought to modify, amend, vacate, or appeal the purge order. Therefore, defendant did not comply with the terms of the Decree or the March Opinion.

B. Lack of compliance with respect to the vast majority of retailers/wholesalers.

■ As part of its burden to cure its contempt, New Line was required to, "take any action necessary to cure the contempt at all wholesale and retail outlets within thirty days of this opinion." March Opinion, at 452. However, New Line only distributed corrective materials to 23% of wholesalers and distributors who responded but made no efforts whatsoever to follow up with respect to the 87% of retailers and 77% of wholesalers who did not respond to the initial mailing. New Line and its counsel had to have known that failure to follow up in some manner with respect to the 87% of retailers and 77% of wholesalers and distributors that did not respond to the initial mailing ensured that the marketplace would be largely unaffected by New Line's cure efforts.

New Line has failed to take action with regards to the great majority of distributors, wholesalers, and retailers to remove copies of the Lawnmower Man video cassette bearing Stephen King's name. In a case similarly situated, this court held a defendant to be in contempt for failure to obey an order requiring the defendant to remove copies of a catalog from the market. Because the defendant only removed 1500 of 5200 catalogs, this court held that defendant had failed to comply because of its lack of literal compliance and also for its lack of vigor in attempting to comply. *Matenciot v. David & Dash, Inc.,* 422 F.Supp. 1199, 1209 (S.D.N.Y.1976) (Motley, J.). In the same sense, New Line has failed to literally comply with the Decree and the March Opinion. New Line's actions only affected, at most, 23% of the marketplace while 77% of the market is unchanged.

■ Having determined that plaintiff has established defendant's failure of compliance by clear and convincing evidence, the court must determine what relief is appropriate in these circumstances. The court's opinion of March 25, 1994 provided that if defendant did not comply, "it will be required to pay a fine to plaintiff in the amount of $10,000 per day until its noncompliance is cured."

■ Where the sanction is awarded to enforce compliance, courts have discretion in fashioning an appropriate remedy. *United States v. United Mine Workers of America,* 330 U.S. 258, 304, 67 S.Ct. 677, 701, 91 L.Ed.

884 (1947); *Vuitton et Fils S.A. v. Carousel Handbags*, 592 F.2d 126, 130 (2d Cir.1979). The court should consider several factors in exercising its discretion, including "the character and magnitude of the harm threatened by continued contumacy, ... the probable effectiveness of any suggested sanction in bringing about the [desired result]," and "the amount of the defendant's financial resources and the consequent seriousness of the burden to that particular defendant." *United Mine Workers*, 330 U.S. at 304, 67 S.Ct. at 701. However, the ultimate consideration is whether the coercive fine is reasonably related to the facts and not arbitrary. *Perfect Fit Industries v. Acme Quilting Co.*, 673 F.2d 53, 57 (2d Cir.), *cert. denied*, 459 U.S. 832, 103 S.Ct. 73, 74 L.Ed.2d 71 (1982).

During the course of this litigation, New Line has repeatedly failed to comply with the terms of the Decree. In the March 25, 1994 opinion, this court noted that plaintiff had already found two occasions of defendant's noncompliance. At the November 1, 1994 contempt hearing, plaintiff once again presented evidence of defendant's noncompliance. Given this background showing defendant's gross disregard for this court's orders, defendant is required to pay a fine to plaintiff in the amount of $10,000 per day from the date of the entry of this opinion and accompanying order until its noncompliance is cured. Such sanctions are consistent with the body of Second Circuit case law regarding contempt sanctions designed to effect compliance with court orders. Daily penalties in excess of $10,000 per day have been upheld. *U.S. v. International Brotherhood of Teamsters*, 954 F.2d 801 (2d Cir.1992); *N.Y. Nat'l Org. for Women v. Terry*, 886 F.2d 1339 (2d Cir.1989); *In re Marc Rich & Co. A.G.*, 739 F.2d 834 (2d Cir.1984). This Circuit has also upheld the payment of these sanctions to the plaintiff when assessed daily or as multiple damages. *State of N.Y. v. Shore Realty Corp.*, 763 F.2d 49 (2d Cir. 1985); *N.A. Sales Co., Inc. v. Chapman Industries Corp.*, 736 F.2d 854, 858 (2d Cir. 1984) (treble damages awarded to ensure compliance).

In remedying this contempt, defendant is required to contact by certified mail, return receipt requested all non-responding entities from the April 7 to April 9, 1994 mailings to determine their current inventory of the Lawnmower Man and whether the entities have received adequate corrective stickers to comply with the Decree. A copy of the Decree, as so ordered by this court, is to be enclosed. Defendant must then correct any deficiencies within thirty days of this opinion. If the entities do not respond to this mailing, defendants are required to speak by telephone to the manager/supervisor of the entity to determine the quantities of corrective stickers needed. At the end of this period, plaintiff is entitled to conduct an investigation to measure defendant's compliance and submit findings to this court. If, based on those findings, this court finds that defendant has not substantially complied with the aforementioned requirements, this court will, in addition to the fine of $10,000 per day, order a complete recall of all videocassettes and laser discs of the Lawnmower Man in the possession of all retailers and distributors.

With respect to attorney's fees, according to the March Opinion, plaintiff is further awarded all costs and attorney's fees incurred in connection with all activities leading up to, related to, or arising out of the March Opinion, including without limitation the costs of plaintiff's investigation conducted pursuant to the March Opinion, all plaintiff's attorney's fees and costs incurred in all proceedings leading up to the issuance of this Order, and all subsequent proceedings relating hereto.

## CONCLUSION

For the reasons stated above, this court finds defendant New Line in contempt of the Final Consent Decree. As a result New Line must cure this contempt to the satisfaction of this court no later than thirty days from the effective date of this opinion and accompanying order. Until it cures its contempt, defendant must pay to plaintiff a fine of $10,000 per day. Should the court find that defendant has not complied with this court's order, defendant will, in addition, be ordered to totally recall all Lawnmower Man videocassettes and laser discs.

### Order on Finding of Contempt

Pursuant to the attached opinion, New Line has failed to cure its contempt. As of the date of this order and until New Line cures its contempt, defendant must pay to plaintiff a fine of $10,000 per day.

Defendant is ordered to cure its contempt to the satisfaction of this court in accordance with this court's opinion herein no later than thirty days from the effective date of this order.

SO ORDERED.