Jon J. DUQUIN, Plaintiff,

v.

Helen DEAN, Deputy Superintendent for Programs, Defendant.

No. 99 Civ. 12458(RWS).

United States District Court, S.D. New York.

April 3, 2006.

Katten Muchin Zavis Rosenman, New York, NY (Julie Pechersky, Joanna M. Bernard, of Counsel), for Plaintiff.

Eliot Spitzer, Attorney General of the State of New York, New York, NY (Lisa Fleischmann, Julia Lee, Assistant Attorneys General, of Counsel), for Defendant.

## OPINION

SWEET, District Judge.

Defendant Helen Dean ("Defendant" or "Dean") has moved for summary judgment pursuant to Rule 56, Fed.R.Civ.P., against plaintiff Jon Duquin ("Plaintiff" or "Duquin"). For the reasons set forth below, Dean's motion for summary judgment is granted and Duquin's complaint is dismissed in its entirety.

### Prior Proceedings

Duquin filed his original complaint in the district court for the Western District of New York on November 5, 1998. The complaint was amended on August 9, 1999. At all relevant times Duquin was incarcerated at Wende Correctional Facility ("Wende"). In the amended complaint Duquin alleged that Dean, the Deputy Supervisor for Programs at Wende, along

with several other defendants [1] (collectively, "Defendants") violated his rights under the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12131 *et seq.*, and the Rehabilitation Act, 29 U.S.C. § 794 *et seq.*, by failing to provide (1) qualified sign language interpreters for orientation, medical appointments, grievance hearings, confidential communications with staff, and vocational and educational programs; (2) effective visual fire alarms; (3) use of closed-captioned television sets to permit viewing comparable to that enjoyed by hearing inmates; and (4) access to text telephones ("TTY") equivalent to hearing inmates' access to telephone service.

On October 27, 1999, the attorney then representing Duquin filed a motion seeking a change of venue to the Southern District of New York, and on December 21, 1999, the Honorable William M. Skretny of the Western District upon consent granted the motion. The motion was premised on this Court's consent order in *Clarkson v. Coughlin*, 91 Civ. 1792,[2] (the "Consent Decree").

On May 14, 2002, Defendants moved to dismiss Duquin's complaint for improper venue or, alternatively, to transfer venue back to the Western District of New York. In an opinion dated October 30, 2002 and entered November 1, 2002, this Court held that venue was proper and that Plaintiff's complaint would be treated as a motion for contempt under the Consent Decree. *Figueroa v. Dean*, Nos. 99 Civ. 12457(RWS) & 99 Civ. 12458(RWS), 2002 WL 31426205, at *1, *4 (S.D.N.Y. Oct. 30, 2002).

On October 15, 2004, Defendants moved to dismiss the amended complaint for lack of personal jurisdiction. By opinion dated December 7, 2004, this Court granted the motion to dismiss without prejudice as to all defendants except Dean.

Dean filed the instant motion for summary judgment on February 14, 2005. Plaintiff's opposition was filed on May 12, 2005, and oral arguments on motions for summary judgment were heard in this and a companion case, *Figueroa v. Dean*, No. 99 Civ. 12457, on June 8, 2005. Dean filed a reply in support of the motion on July 11, 2005, whereupon the matter was marked fully submitted.

In his memorandum of law in opposition to the motion for summary judgment, Duquin for the first time raised a claim regarding the lack of an ombudsperson at Wende as mandated by the Consent Decree. Because Duquin did not plead any facts on the face of the complaint to sup-

---

1. Glenn Goord, Commissioner of New York State Department of Correctional Services; Edward Donnely, Superintendent; Mr. Cook, Lieutenant; Mr. Amato, Lieutenant; Mr. Zydel, Sergeant; Mr. Blask, Sergeant; Mr. Nowak, Corrections Officer; Mr. Mann, Corrections Officer; Mr. Rizzo, Corrections Officer; Mr. MacEvoy, Corrections Officer; Ms. Roe, Nurse Administrator, whose identity was unknown; Mr. Menadez, Corrections Officer; Mr. Hurley, Sergeant; and Mr. Kurek, Supervisor of Education, Wende Correctional Facility.

2. *Clarkson* was commenced in this Court as a class action, brought on behalf of hearing-impaired inmates in the custody of the Department of Correctional Services ("DOCS").

In 1995 this Court granted summary judgment awarding declaratory relief, *Clarkson v. Coughlin*, 898 F.Supp. 1019 (S.D.N.Y.1995), and on June 6, 1996, the Court approved a consent judgment and order (the "Consent Decree") granting extensive relief on behalf of the class ("Clarkson Class").

The Clarkson Class consists of two subclasses, the first of which comprises "all present and future deaf and hearing-impaired male inmates of the New York State Department of Correctional Services who have been, are, or will be discriminated against, solely on the basis of their disability, in receiving the rights and privileges accorded to all other inmates." Consent Decree at 2. Duquin contends that he is a member of this subclass.

port this claim, it will not be considered in the instant motion.

### Facts

The facts are taken from the record as well as both parties' Statements of Material Facts Pursuant to Local Civil Rule 56.1. The facts are not in dispute except as noted below.

Relevant provisions of the Consent Decree are set forth in this Court's March 31, 2006 opinion in the companion case of *Figueroa v. Dean*, No. 99 Civ. 12457, familiarity with which is assumed.

Wende is a maximum security facility housing approximately 900 inmates. At all relevant times, Dean was the Deputy Superintendent of Programs at Wende. Duquin was incarcerated at Wende from October 17, 1998 to January 29, 2001 except for two brief periods during the summer of 2000, during which he participated in a work release program at Buffalo Correctional Facility.

Duquin, who was born deaf, contends that he is a member of the class protected by the Consent Decree. Duquin does not use hearing aids and can communicate by using sign language and to some extent by reading lips. He does not read and write "fully," but can do so "well enough" to communicate with Wende staff at least some of the time.

### 1. Interpreters

In 1998 and 1999, Wende shared two staff interpreters, Laurie Mamo and Barbara Seeley, with the nearby Wyoming Correctional Facility, and Duquin occasionally made use of their services. In 2001, Wende hired a full-time staff interpreter, Ann Andzel, who continues to work at Wende.

Department of Correctional Services ("DOCS") Directive No. 2612 ("Directive 2612"), titled "Inmates with Sensorial Dis-abilities," closely tracks the language of the Consent Decree. Directive 2612 states that correctional facilities may use inmate interpreters as well as staff interpreters so long as the inmate interpreters are "able to interpret effectively, accurately, and impartially both receptively and expressively" and "factors such as emotional or personal involvement and considerations of confidentiality will not adversely affect their ability to interpret . . . or jeopardize the safety and security of the inmate."

Since 1998, inmate interpreters have been used for educational and vocational classes at Wende. In classes in which videos are used, Wende also provides closed-captioned text displays for hearing-impaired inmates. Duquin testified at deposition that "he turned down [inmate] interpreter services most of the time." He indicated that he felt some of the inmate interpreters were not qualified because they could only finger spell and could not understand full sign language. However, Duquin also testified that "for vocational thing or school, that was okay having an inmate interpreter," because he insisted on having interpreters "that could sign fairly well." Duquin expressed dissatisfaction with the services of an inmate interpreter who was provided for a GED class, and refused to continue with the class. Duquin noted that Wende officials initially did not know he had already received his GED, "so we had to go through a lot of rigamarole [sic] before we proved that I did." After proving his GED certification, Duquin was assigned to work as a porter. Despite indicating at deposition that he wanted to take part in other types of work programs, Duquin also testified that he "never asked for any kind of program. I stayed in the porter [sic]."

When hearings were held on grievances filed by Duquin, he was provided with an inmate interpreter, although he testified

that on at least some occasions he refused their services because he believed the inmate interpreters were not certified and there was "no confidentiality." For disciplinary hearings, he was provided with the assistance of a staff interpreter.

Whenever Duquin had a doctor's appointment, he was assisted by staff interpreter Laurie Mamo. As of October 12, 1999, staff interpreters were available at nurse's sick call on Tuesdays and Thursdays when needed. Hearing-impaired inmates were required to sign up for sick call the evening before, so that Wende could ensure the presence of an interpreter. Duquin testified at deposition that he went to sick call as an "emergency type thing" two or three times and was never provided with a staff interpreter. He was offered an inmate interpreter on all these occasions, but he refused their services.

### 2. Visual Fire Alarms

It is undisputed that Wende currently has visual fire alarms in D Block, SHU, and all program areas. These alarms are placed about eight feet high on the cellblock wall and are visible from the cells. When the fire alarms are activated, lights flash and an audio alarm sounds. The alarms are inspected on a regular basis in accordance with the Wende Fire Emergency Procedures.

Duquin testified at deposition that during the time he was incarcerated at Wende the facility had no visual fire alarms. A November 30, 2001 email from Dean to Donna Masterson, ADA Coordinator at Wende, notes the need for "audio visual units (strobe lights)" for units housing hearing-impaired inmates. Masterson testified in her deposition that the units already had visual fire alarms at the time the email was sent, and that Dean was specifically requesting strobe lights to replace the existing visual alarms. William

Figueroa, plaintiff in the companion case of *Figueroa v. Dean*, No. 99 Civ. 12457, also stated in his complaint that there were no visual fire alarms at Wende. However, he testified at deposition only that the alarms were "very old" at the time of his complaint, and his filed grievances cited the "weak" light given off by the alarms.

Additional email correspondence between several Wende administrators questioned the need for installing new flashing alarms in locked areas in light of the established procedure for manually notifying hearing-impaired inmates of emergencies. Because Wende is a maximum-security facility, inmates are not allowed freedom of movement even during emergencies. The cell doors and all gates between areas must be unlocked by officers. The corrections officers are trained to make sure that, in the event of a fire, all cells and appropriate gates are unlocked and inmates are evacuated. Duquin contends that such procedures were not followed on at least two occasions during fires where no one came to notify him to leave his cell. Fellow inmate Figueroa testified at deposition that fires in the cellblocks occurred several times a week.

### 3. TTY Telephone Access

DOCS and Wende policy on inmate access to TTY is clearly established. Directive 2612 provides that access to TTY by hearing-impaired inmates shall be equivalent to access to telephone service for hearing inmates, except that TTY users will be granted twice the amount of time to communicate. Wende Policy and Procedure No. 2312 ("P & P 2312"), titled "Inmate Phone Home Program," establishes that calls by hearing inmates will be limited to ten minutes if other inmates are waiting, and that no call will exceed thirty minutes. In accordance with the Consent

Decree and Directive 2612, P & P 2312 also provides that TTY calls will be limited to twenty minutes if other inmates are waiting, and that no call shall exceed sixty minutes. Prior to 2000, the allowable length of calls was ten and twenty minutes for hearing and hearing-impaired inmates, respectively, regardless whether other inmates were waiting to use the telephone.

All inmates may be subject to telephone use restrictions. Corrections Counselor John Cabrera testified that both hearing and hearing-impaired inmates have to request use of the telephone, and must use the telephone in accordance with a schedule. In contrast, Duquin testified that hearing inmates are able to use the telephone at any time without sergeant approval. Most inmate telephones are capable of collect calls only. However, because TTY uses a relay operator, inmate use of the TTY must be monitored by corrections officers to prevent inmate calls being billed to the facility. The TTY units at Wende are placed in locked boxes to ensure monitoring and prevent unauthorized use.

Inmates may lose telephone privileges entirely as a result of disciplinary action. Dean affirmed that Duquin lost telephone privileges from April 9, 1999 to April 14, 1999; from July 11, 1999 to February 10, 2000; and from September 5, 2000 to November 4, 2000 as a result of disciplinary action. The TTY telephone log book for 1999 shows that Duquin used the TTY several times per week during periods when he had telephone privileges, more than any other hearing-impaired inmate.

In 1998 and 1999, the TTY for B Block (the unit in which hearing-impaired inmates then resided) was located in the B Block sergeant's office. Inmates wishing to use the TTY had to ask the officer for access and if the office was being used by staff, the inmate had to be rescheduled. After inmates filed grievances about this procedure, the policy and the location of the TTY were changed.

Duquin filed grievances about access to the TTY on B Block during the day shift (7 A.M.—3 P.M.) on January 22 and 23, 1999. He alleged that Corrections Officer Mann was ignoring his requests to use the TTY. In a memo to Sergeant Higley, Mann indicated that he was not assigned to B Block on many of the days in question, and that there often was not enough time to monitor TTY calls during the day shift due to the amount of other daily activity. The Inmate Grievance Program Committee report advised Duquin to request calls during the 3 P.M.—11 P.M. shift "when the phone home program is scheduled."

On June 22, 1999, Duquin wrote a letter to Dean complaining in part about TTY access. He stated that he had been denied use of the TTY in the morning for seven days in a row. He also noted that while four new telephones had been installed in the B Block yard, there was no TTY telephone in the B Block yard for hearing-impaired inmates. Duquin was informed by S. Dolce, Acting Deputy Superintendent of Programs, that "increased access" to TTY was forthcoming.

Duquin was placed in protective custody on E Block on February 4, 2000 after being threatened by other inmates. On March 5, 2000, he wrote a letter to Dean complaining about access to TTY on E Block. Dean responded by memorandum dated March 10, 2000, indicating that Duquin had been permitted to use the TTY in the counselor's office, and that a more accessible TTY would soon be installed in E Block. An April 11, 2000 memorandum from Robert Raymond, Affirmative Action Administrator, to Donna Masterson, ADA Coordinator, indicates that as a result of a complaint filed by Duquin, a broken TTY unit had been identified and a replacement unit had been ordered and received. On

December 6, 2000, Duquin filed a grievance again requesting access to the E Block TTY during the day shift and asked that a TTY unit be installed in the E Block yard. A Wende work order summary dated December 21, 2000 indicates that two additional TTY lines were due to be installed on E Block.

### 4. *Closed–Captioned Television*

As of December 28, 2000, large closed-captioned color televisions for general viewing were located in the following public areas in Wende: all recreation yards, B Block yard, C Block yard, E Block yard, the third floor of E Block (the protective custody unit), ICP yard, and the Gallery. Dean testified that closed-captioning is always turned on when hearing-impaired inmates are in the yards.

A Wende inmate who wishes to have a television in his cell must obtain one from the commissary. Inmates are not permitted to have televisions in their cells during periods of disciplinary confinement. Duquin did not have television privileges from April 9, 1999 to April 14, 1999, from July 11, 1999 to March 11, 2000, and from September 5, 2000 to November 4, 2000 as a result of disciplinary infractions.

At all times relevant to Duquin's complaint, the only type of television permitted under Wende policy for use in inmate cells was a twelve-inch black-and-white model. Hearing-impaired inmates who desired a cell television were required to purchase both the television and a separate closed-caption decoder, available from Radio Shack, to be installed by facility staff.

In a grievance filed December 15, 2000, Duquin asked for permission to purchase a thirteen-inch color television with built-in closed-captioning for cell use, arguing that the decoder available from Radio Shack would not work with the older twelve-inch model sold by the commissary. After a

thorough review of the grievance, including an interview between Dean and Duquin, he was informed that DOCS and Wende policies did not permit color televisions or any sets with a diagonal screen measurement greater than twelve inches to be used in inmate cells. Wende grievance records show that Radio Shack was contacted to ensure that the available decoders would work with twelve-inch black-and-white televisions. Duquin did not attempt to have the available decoder installed on a television obtained from the commissary.

The Court notes that Wende changed its policy with respect to decoders in the summer of 2001. Since that time, closed-caption decoders have been purchased by the facility and installed on televisions without cost to the inmate. An inmate approved for closed-captioning may lease a properly equipped television from the commissary. Upon transfer or release from Wende, the lease price will be refunded to the inmate in exchange for the return of the undamaged television.

Duquin testified that although there were closed-captioned televisions available in common areas, he did not ask that the closed-captioning be turned on because he was afraid of being harmed by hearing inmates who preferred that the captioning be kept off. Despite the frequency with which Duquin filed grievances, there is no indication that he ever communicated this concern to Dean or other Wende staff.

### *Discussion*

#### *Standard for Summary Judgment on the Merits*

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, summary judgment is appropriate where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). The

moving party has the initial burden of showing that there are no material facts in dispute, *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970), and can discharge this burden by demonstrating that there is an absence of evidence to support the nonmoving party's case. *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The nonmoving party then must come forward with "specific facts showing that there is a genuine issue for trial," Fed.R.Civ.P. 56(e), as to every element "essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex,* 477 U.S. at 322, 106 S.Ct. 2548.

The Court "must resolve all ambiguities and draw all reasonable inferences in favor of the party defending against the motion." *Lopez v. S.B. Thomas, Inc.,* 831 F.2d 1184, 1187 (2d Cir.1987); *Eastway Const. Corp. v. New York,* 762 F.2d 243, 249 (2d Cir. 1985). However, the Court must inquire whether "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party...." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Thus, where "substantive law compels a heightened evidentiary scrutiny, a court must apply such scrutiny at the summary judgment stage," *Helmsley–Spear, Inc. v. Westdeutsche Landesbank,* 692 F.Supp. 194, 203 (S.D.N.Y.1988) (citing *Anderson,* 477 U.S. at 255, 106 S.Ct. 2505), and grant summary judgment where the nonmovant's evidence is not sufficiently probative. *See Anderson,* 477 U.S. at 249–50, 106 S.Ct. 2505.

■ "The imposition of a civil contempt order is a severe sanction subject to a higher standard of proof than the 'preponderance of the evidence' standard applicable to ordinary cases." *King v. Allied Vision Ltd.,* 155 F.R.D. 440, 448 (S.D.N.Y.

1994) (internal quotations and citations omitted). The Court should exercise this inherent power only when "the proof of noncompliance is clear and convincing ... and ... the party has not diligently attempted in a reasonable manner to comply." *Scottish Air Intern., Inc. v. British Caledonia Group, PLC,* 867 F.Supp. 262, 266 (S.D.N.Y.1994).

To properly resolve the instant motion the Court first must determine whether Dean has demonstrated the absence of any genuine issues of material fact. If so, the Court must inquire whether Duquin has adduced specific facts sufficient for a jury to find that (a) proof of Dean's noncompliance with the Consent Decree is clear and convincing, and (b) Dean has not diligently attempted in a reasonable manner to comply with the Decree.

### *The Motion for Summary Judgment on the Merits Is Granted*

For each claim and request for relief in Duquin's complaint, Dean has met her initial burden of showing no genuine dispute of material fact as to either (a) her compliance with the requirements of the Consent Decree, or (b) her diligent attempt to comply in a reasonable manner. Because Duquin has not met his subsequent obligation to put forth specific facts supporting a finding of contempt, the motion for summary judgment on the merits is granted.

#### 1. *Sign Language Interpreters*

■ Dean has met her burden of demonstrating the absence of any genuine dispute of material fact as to (a) the availability of both staff and inmate interpreters at Wende and (b) Dean's diligent efforts to comply with the requirements of the Consent Decree on this issue. The established policies of DOCS and Wende regarding interpreters closely track the language of the Consent Decree. The record shows that for educational and vocational pro-

gramming, Duquin was provided with the services of an inmate interpreter, although he at times refused their services. Evidence also shows that staff interpreters were regularly available for medical appointments and disciplinary hearings. Furthermore, all indications are that Dean and Wende have made a consistent effort to improve interpretation services and comply with the Consent Decree by ensuring that staff interpreters are certified, hiring a full-time staff interpreter, and requiring medical records to note the presence of an interpreter at appointments.

In response, Duquin fails to provide specific facts sufficient to avoid summary judgment. He states that only inmate interpreters were made available for sick calls, and that he refused their services because of the confidential nature of the medical consultation, as is his right. However, he acknowledges that his attendance at sick call was on an emergency basis, and does not indicate whether he notified Wende administrators in advance to ensure the presence of a staff interpreter, as was then required by facility policy. Duquin also does not show that communication with the nurses at sick call was "critical to the efficacy of treatment" or his "safety or security." Without such a showing, he can not demonstrate a clear and convincing violation of the Consent Decree.

Duquin does not dispute the presence of inmate interpreters at vocational training and grievance hearings or Wende's use of videos and other technical devices to better accommodate hearing-impaired inmates. Instead, Duquin disputes whether the inmate interpreters provided were qualified within the meaning of the Consent Decree. It is unnecessary here to decide the question as to each and every inmate interpreter, as Duquin testified that he simply turned down unqualified interpreters, and that it "was okay" having an interpreter for vocational classes because he was provided with interpreters who could sign "fairly well."

## 2. *Visual Fire Alarms*

■ Here, too, Defendant Dean has met the initial burden that is placed on one who moves for summary judgment. It is undisputed that Wende is currently equipped with visual fire alarms that meet the requirements of the Consent Decree. Evidence also suggests that visual alarms were in place at all times relevant to the complaint. Even assuming that Wende was not always equipped with visual alarms, email correspondence between Wende administrators acknowledged that in emergency situations corrections officers are responsible for unlocking each cell door and ensuring that inmates evacuate. The Consent Decree explicitly provides for such "equally effective manual means of notification." The email correspondence also demonstrates a commitment to compliance with the requirements of the Consent Decree.

Duquin does not respond with facts sufficient for a jury to find by clear and convincing evidence that Dean is in contempt of the Consent Decree. His mere assertion that Wende had no visual fire alarms cannot support such a finding, as Duquin does not dispute that Wende policy required manual notification of each inmate to be evacuated in an emergency. Indeed, Duquin can point to only two or three cases in which he asserts he was not so notified. Given William Figueroa's testimony that cellblock fires were a frequent occurrence, Duquin cannot show clear and convincing proof of a Consent Decree violation, let alone the lack of a diligent effort to comply on the part of Defendant.

### 3. *TTY Telephones*

Duquin's next claim focuses on the availability of TTY telephones; specifically, his contention that Wende did not provide equivalent access to TTY for hearing-impaired inmates as compared with hearing inmates' access to telephone service.

■ While Dean cannot show the absence of any genuine dispute of material fact regarding access to TTY, she has met her initial burden with respect to her diligent efforts to comply with the Consent Decree. The record shows that at various times prior to 2001 certain areas within Wende provided only limited access to TTY, while other areas lacked TTY altogether. Yet the record also is replete with examples of Defendant's diligent efforts to comply with the Consent Decree. On each occasion that Duquin complained about access to TTY, Dean or other DOCS staff responded with temporary accommodations and permanent improvements. Where TTY units were not available on cellblocks, Duquin was permitted to use the TTY in the counselor's office until more accessible TTY were made available. Repairs to broken equipment were made promptly. Additional TTY units were ordered and installed in the B and E Block yards.

Duquin has not met this showing by Defendant with specific facts giving rise to a genuine dispute about material facts regarding Dean's diligent efforts to comply with the Consent Decree. Rather, the facts offered by Duquin go to the question of Wende's compliance with the equivalent access provisions of the Consent Decree. As previously stated, the Court should find a party in contempt only when "the proof of noncompliance is clear and convincing . . . and . . . the party has not diligently attempted in a reasonable manner to comply." *Scottish Air Int'l*, 867 F.Supp. at 266. Dean's substantial and continuous efforts to comply in a reasonable manner with the Consent Decree preclude a finding of contempt.

### 4. *Closed–Captioned Televisions*

■ The core of Duquin's claim regarding closed-captioned television concerns the availability of closed-captioning for the twelve-inch televisions permitted by Wende policy for use in cells. As to this issue, Dean has made the requisite initial showing that there is no genuine dispute of material fact. Duquin does not dispute that his request for a thirteen-inch color television was barred by facility policy. Wende staff confirmed with suppliers that there was no technological barrier to installing available decoders in the televisions available from the commissary. The subsequent decision by Wende administrators to purchase and install the decoders on commissary televisions demonstrates that it would have been possible for Duquin to do so. Duquin's assertion that his brother-in-law told him the closed-caption decoder would not work is not sufficient for a jury to decide by clear and convincing evidence that Wende's denial of his request for a thirteen-inch color TV constituted a violation of the Consent Decree.

■ Duquin also argues that he was not provided equivalent access to television because he was expected to pay for the closed-caption decoder himself, while hearing inmates only had to purchase a television. While Wende has since changed its policy to eliminate this extra expense for hearing-impaired inmates, the Court notes that the Consent Decree does not obligate DOCS or its employees to provide closed-captioned televisions for personal use in cells at no additional cost. It is reasonable to expect inmates to bear the cost of television equipment purchased for personal use.

The presence of numerous closed-captioned televisions in common areas at Wende and the reasonable responses to Duquin's requests and grievances demonstrate Dean's diligent efforts to comply with the Consent Decree on this issue. Duquin's assertion that he was afraid to use the closed-captioning on televisions in common areas does not raise any dispute as to Dean's diligent efforts to comply, as there is no evidence that he ever communicated this concern to Wende staff.

*Conclusion*

For the foregoing reasons, Dean's motion for summary judgment is granted and Duquin's complaint is dismissed in its entirety.

It is so ordered.